1   MARTIN D. BERN (State Bar No. 153203)
    martin.bern@mto.com
2   CAROLINE C. LITTEN (State Bar No. 329449)
    carrie.litten@mto.com
3   MUNGER, TOLLES & OLSON LLP
    350 South Grand Avenue
4   Fiftieth Floor
    Los Angeles, California 90071-3426
5   Telephone:    (213) 683-9100
    Facsimile:    (213) 687-3702
6
7   Attorneys for Wells Fargo Bank, N.A.

8                     UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10

11  DENISE DROESCH and SHAKARA            Case No. 3:20-cv-06751-JSC
    THOMPSON, individually, and on behalf of
12  all others similarly situated,         **WELLS FARGO BANK, N.A.'S
                                           OPPOSITION TO PLAINTIFFS' MOTION
13            Plaintiffs,                   TO CONDITIONALLY CERTIFY
                                           COLLECTIVE FLSA ACTION**
14        vs.
                                           Magistrate Judge:  Hon. Jacqueline Scott Corley
15  WELLS FARGO BANK, N.A., a United       Courtroom:         E
    States Corporation, and DOES 1 - 100,  Date:              May 13, 2021
16  inclusive,                             Time:              9:00 a.m.

17            Defendants.

18                                         Complaint Filed:  September 28, 2020

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................1

II.     FACTUAL BACKGROUND .............................................................................4

        A.      Plaintiffs Were Aware of Wells Fargo's Compliant Timekeeping Policies ............4

        B.      Plaintiffs Certified That Their Time Entries Were Accurate And Never Reported Any Concerns to Human Resources or the EthicsLine ............................6

        C.      Plaintiffs Seek Conditional Certification of a Broad Collective That Reported To More Than 4,800 Supervisors At Over 590 Call Centers Nationwide .................................................................................................................7

        D.      At Deposition, Thompson Contradicted The Allegations In Her Complaint............7

                1.      Thompson Accurately Recorded All Time Worked In Time Tracker, Including Time Worked Before and After Her Scheduled Shift...................7

                2.      Thompson Claims Her Supervisor, On Occasion, Raised Questions About The Accuracy of Her Time Entries ....................................................8

                3.      Thompson's Manager Told Her in Writing That Her Time Tracker Did Not Need To Match Her Softphone Login/Logout Times ....................9

                4.      Thompson's Time Tracker Entries Do Not Match Her Softphone Logon/Logoff Most of The Time ...............................................................10

                5.      Thompson Sometimes Logged Into Her Softphone Before Launching Other Software Applications................................................10

                6.      Supervisors at the Charlotte Call Center Did Not Instruct Their Team Members To Under-Report Their Time Worked ...............................11

                7.      Thompson Recorded in Time Tracker That She Was Working At Her Desk When She Was Not Even in the Building...................................11

        E.      Plaintiff Droesch's Deposition Testimony Contradicts The Allegations In The Complaint And Her Motion To Conditionally Certify .....................................12

                1.      Droesch Testified That She Was Orally Instructed To "Exactly Match" Her Time Tracker to Her Softphone Login/Logout Times ...........12

                2.      Droesch's Time Tracker Entries Rarely Match Her Softphone Login/Logout times ................................................................................12

                3.      Droesch Was Solicited To Become A Plaintiff In This Action ..................13

        F.      At Deposition, Harrison Contradicted The Allegations In The Complaint............13

                1.      Harrison Accurately Recorded All Time Worked In Time Tracker, Including Time Worked Before and After His Scheduled Shift .................13

2. Harrison Claims That His Supervisor Instructed Him To Correct His Time Tracker Entries Between 10-20 Times Over a 3.5-Year Period .........13

3. Harrison's Time Tracker Entries Do Not Match His Softphone Logon/Logoff Most of The Time .................................................14

4. Harrison Recorded in Time Tracker That He Was Working at His Desk When He Was Not Even in the Building ...............................14

III. ARGUMENT ..............................................................................................15

A. Plaintiffs Have Not Met Their Burden of Showing That All Telephone-Dedicated Employees Across The Nation Are "Similarly Situated" .....15

1. Off-The-Clock Cases Relying Upon Oral Instructions From Supervisors Necessarily Involve Individualized Inquiries .........................15

2. Plaintiffs' Claims Cannot Be Resolved Without Individualized Inquiries, Thus Precluding Conditional Certification ...............17

3. Plaintiffs' Declarations Provide No Evidence of A "Common Plan or Policy" To Require Call Center Employees To Work Off-the-Clock ........................................................................20

B. Plaintiffs Arguments for Broad Notice Are Overreaching.....................................23

IV. CONCLUSION ....................................................................................25

WELLS FARGO BANK, N.A.'S OPPOSITION TO PLAINTIFFS' MOTION TO CONDITIONALLY CERTIFY COLLECTIVE FLSA ACTION

1

**TABLE OF AUTHORITIES**

2

**Page**

3

**FEDERAL CASES**

4

*Alaniz v. City of Los Angeles*,
No. CV 04-8592-GAF, 2014 WL 12694157 (C.D. Cal. May 21, 2014), aff'd
sub nom. *Campbell v. City of Los Angeles*, 903 F.3d 1090 (9th Cir. 2018)..............................21

5

6

*Amaraut v. Sprint/United Mgmt. Co.*,
No. 19-cv-411-WQH-MDD, 2019 WL 5696685 (S.D. Cal. Nov. 4, 2019)..............................24

7

8

*Bentley v. Cty. of Los Angeles*,
No. CV 09-02063-RGK(CWX), 2009 WL 10674394 (C.D. Cal. Sept. 15, 2009) ...............1, 16

9

*Campbell v. City of Los Angeles*,
903 F.3d 1090 (9th Cir. 2018)............................................................................................1, 15, 20

10

11

*Colson v. Avnet, Inc.*,
687 F. Supp. 2d 914 (D. Ariz. 2010)...............................................................................................21

12

13

*Donatti v. Charter Commc'ns, LLC.*,
2012 WL 5207585 (W.D. Mo. Oct. 22, 2012) .............................................................................25

14

15

*Estorga v. Santa Clara Valley Transp. Auth.*,
No. 16-cv-02668-BLF, 2017 WL 2604665 (N.D. Cal. June 15, 2017) .............................24, 25

16

17

*Fowler v. Wells Fargo Bank, N.A.*,
No. 17-CV-02092-HSG, 2019 WL 330910 (N.D. Cal. Jan. 25, 2019) ...................................25

18

*Guilbaud v. Sprint/United Mgmt. Co.*,
No. 13-cv-04357-VC, 2014 WL 10676582 (N.D. Cal. Oct. 3, 2014).......................................24

19

20

*Harris v. Vector Mktg. Corp.*,
716 F. Supp. 2d 835 (N.D. Cal. 2010) .............................................................................24, 25

21

*Hoffmann-La Roche Inc. v. Sperling*,
493 U.S. 165 (1989) ...........................................................................................................4, 25

22

23

*Howard v. Gap, Inc.*
No. C 06-06773 WHA, 2009 WL 3571984 (N.D. Cal. Oct. 29, 2009) ...................................15

24

25

*Juarez v. Jani-King of Cal., Inc.*,
273 F.R.D. 571 (N.D. Cal. 2011) .........................................................................................16

26

*Lallathin v. Ro Ro Inc.*,
No. 1:09–cv–1293–WTL–DML, 2010 WL 2640271 (S.D. Ind. June 28, 2010)......................21

27

28

WELLS FARGO BANK, N.A.'S OPPOSITION TO PLAINTIFFS' MOTION TO CONDITIONALLY CERTIFY
COLLECTIVE FLSA ACTION

*Lawrence v. City of Philadelphia,*
   No. 03-CV-4009, 2004 WL 945139 (E.D. Pa. 2004)...........................................................1, 17

*Litty v. Merrill Lynch & Co.,*
   No. CV 14-0425 PA, 2014 WL 5904907 (C.D. Cal. Aug. 4, 2014) ........................................15

*Luksza v. TJX Cos., Inc.,*
   No. 2:11-CV-01359-JCM-GWF, 2012 WL 3277049 (D. Nev. Aug. 8, 2012) ...................20, 21

*Madrigal v. Tommy Bahama Grp, Inc.,*
   No. CV 09-08924 SJO CWx, 2011 WL 10511339, at *5 (C.D. Cal. June 27,
   2011).........................................................................................................................................16

*Magana-Munoz v. W. Coast Berry Farms, LLC,*
   No. 5:20-cv-02087-EJD, 2020 WL 3869188 (N.D. Cal. July 9, 2020) ..................................23

*Nen Thio v. Genji, LLC,*
   14 F. Supp. 3d 1324 (N.D. Cal. 2014) ...................................................................................15

*Russell v. Wells Fargo & Co.,*
   No. C 07-3993 CW, 2008 WL 4104212 (N.D. Cal., Sept. 3, 2008) ........................................24

*Sarinana v. DS Waters of Am., Inc.,*
   No. C-13-0905 EMC, 2014 WL 12770237 (N.D. Cal., June 9, 2014) ....................................25

*Simmons v. T–Mobile USA, Inc.,*
   No. H–06–1820, 2007 WL 210008 (S.D. Tex. Jan. 24, 2007)............................................2, 21

*Songer v. Dillon Res., Inc.,*
   569 F. Supp. 2d 703 (N.D. Texas 2008) ................................................................................15

*Swales v. KLLM Transp. Servs., L.L.C.,*
   985 F.3d 430 (5th Cir. 2021)...........................................................................................3, 4, 25

*Viceral v. Mistras Grp., Inc.,*
   No. 15-cv-02198-EMC, 2016 WL 5907869 (N.D. Cal., Oct. 11, 2016)..................................25

*Wal-Mart Stores, Inc. v. Dukes,*
   564 U.S. 338 (2011) ...............................................................................................................15

**FEDERAL STATUTES**

Fair Labor Standards Act § 216(b) ........................................................................................ passim

1   I.      **INTRODUCTION**

2          Plaintiffs seek conditional certification of a nationwide "off-the-clock" collective under

3   Section 216(b) of the Fair Labor Standards Act ("FLSA") comprised of tens of thousands of

4   "telephone-dedicated Call Center employees" at Wells Fargo Bank ("Wells Fargo") who reported

5   to more than 4,800 supervisors at nearly 600 different locations across the nation.  Plaintiffs claim

6   that they were required to be logged in and ready to take incoming customer calls from the

7   beginning to the end of their scheduled work shifts, and that their supervisors would not permit

8   them to record and be paid for pre- and post-shift time logging into and out of software programs.

9   (*See* Mot. at 11-12).  Plaintiffs base their claims on alleged *oral* instructions from their supervisors

10  to correct their time entries on a limited number of occasions.  Courts, however, have regularly

11  denied conditional certification in off-the-clock cases when the claims are based on alleged oral

12  representations by managers or supervisors that contradict the written policy of the employer.  *See,*

13  *e.g. Bentley v. Cty. of Los Angeles*, No. CV 09-02063-RGK(CWX), 2009 WL 10674394, at *2

14  (C.D. Cal. Sept. 15, 2009) (denying conditional certification where the alleged illegal practices

15  and policies were verbal only, and no written policy document supported this allegation) [citing

16  *Lawrence v. City of Philadelphia*, No. 03-CV-4009, 2004 WL 945139 *2 (E.D. Pa. 2004) ("court

17  refused to certify a collective action with respect to the plaintiffs' claims that the defendant did not

18  pay overtime for off-the-clock hours" because "questions of fact in these claims would likely

19  differ for each plaintiff, and would be unduly burdensome to the defendant and the court.").

20         In order to obtain conditional certification, Plaintiffs bear the burden of identifying "not

21  just *any* similarity between party plaintiffs, but a legal or factual similarity material to the

22  resolution of the party plaintiffs' claims, in the sense of having the potential to advance these

23  claims, collectively, to some resolution." *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1115

24  (9th Cir. 2018).  The evidence before the Court, including Plaintiffs' own deposition testimony,

25  demonstrates that there are no material similarities that would permit a collective resolution of the

26  allegations pled on behalf of the putative collective.  Rather, the potential claim of each employee

27  will require numerous individualized inquiries into specific facts and circumstances.

28         As an initial matter, Plaintiffs cannot rely on any written Wells Fargo's policy as evidence

-1-                                                            Case No. 3:20-cv-06751-JSC
WELLS FARGO BANK, N.A.'S OPPOSITION TO PLAINTIFFS' MOTION
TO CONDITIONALLY CERTIFY COLLECTIVE FLSA ACTION

of a "common plan or practice" because the Bank's timekeeping policies specifically instructed non-exempt employees to (i) *accurately* record in Wells Fargo's timekeeping system all time worked, including all of the preliminary and post-liminary work logging into and out of computers and software programs, and (ii) "*certify*" that the time they entered was accurate.  The two named Plaintiffs (Thompson and Droesch), as well as the sole opt-in declarant (Harrison), all concede that they were aware of Wells Fargo's timekeeping policy throughout their employment.

Plaintiffs therefore assert that Wells Fargo had a uniform, collective-wide and *unwritten* policy that was different from the Bank's written timekeeping policies.  Plaintiffs have failed to meet their burden of producing competent evidence that such a policy existed, was applied uniformly to the putative collective, and was sanctioned by Wells Fargo.  *Simmons v. T–Mobile USA, Inc.*, No. H–06–1820, 2007 WL 210008, at *5 (S.D. Tex. Jan. 24, 2007) (denying conditional certification where plaintiff "presented only his own affidavit ... and that evidence is somewhat vague").  Plaintiffs' "evidence" consists entirely on their own nearly-identical declarations.  During deposition, however, Plaintiffs conceded that numerous statements in their declarations were incorrect, while others were based not on any "personal knowledge," but rather on "what [my] lawyers told [me]," assumptions and speculation.  Droesch Depo. at 171:5-9 (Declaration of Martin D. Bern in Support of Wells Fargo Bank, N.A.'s Opposition to Motion to Conditionally Certify Action ("Bern Decl."), Ex. 2).

Plaintiffs' deposition testimony further reveal why their own claims—as well as those of other employees—can only be resolved with individualized inquiries.  Thompson and Harrison testified that they regularly followed Wells Fargo's *compliant written timekeeping policy* and *accurately recorded all* time they worked in Time Tracker, Wells Fargo's timekeeping application.  Then, on isolated occasions only, their supervisors orally questioned the accuracy of certain time entries, and on a *subset* of those occasions, Plaintiffs claim they were instructed to correct certain Time Tracker entries so that they matched their Softphone login times.[1]  When

---

[1] Wells Fargo disputes that any improper instructions were given, and that inquiries by supervisors about time entries were based on information showing those entries may have been incorrect.

1   Plaintiffs' Time Tracker time entries are compared to their first logon and last logoff from

2   Softphone, those times match only a fraction of the time.[2]

3         And when Plaintiff Thompson was asked at deposition to identify even a single day when

4   she was asked by a supervisor to match her Time Tracker to her Softphone, she recalled an

5   exchange of "instant messages" with her supervisor in November 2019.  In that exchange, Plaintiff

6   admitted to making an error in her Time Tracker entry, and then proposed to change her time

7   entries to match her Softphone login and logoff times for that day.  Her supervisor wrote back that

8   "***I do not expect you to input the exact time indicate[d] in daily agent [Softphone] due to***

9   ***finishing claim and/or signing out to leave for the day.***"  Thompson Depo. at 226:16-23 (Bern

10  Decl. Ex. 1); Thompson Depo. Ex. 15 (Bern Decl. Ex. 6).  Thus, the one example Thompson could

11  recall refutes her allegation of an oral "policy" to work off-the-clock.  (Mot. at p. 9.)

12        In sum, resolution of any Plaintiffs' claim will require inquiries into (i) whether the

13  employee was orally instructed to depart from Wells Fargo's written timekeeping policies by a

14  supervisor, (ii) whether the employee followed Wells Fargo's written timekeeping policies or a

15  conflicting oral instruction, (iii) whether the employee made a change to his or her time entry in

16  response to a supervisor's inquiry for any day, (iii) whether any such change was necessary to

17  render the time entry accurate, (iv) whether the employee logged into Softphone first at the start of

18  the day, and (v) whether the employee logged out of Softphone last as the last action of the work

19  day.  In light of the evidence presented with this opposition, the claims of the putative collective

20  cannot be adjudicated based on a single "policy or plan."  *Swales v. KLLM Transp. Servs., L.L.C.*,

21  985 F.3d 430, 442 (5th Cir. 2021) (courts must consider evidence regarding whether merits

22  questions can be answered collectively when determining whether putative collective is similarly

23  situated and conditional certification is appropriate).

24

25  [2] The first login to Softphone will accurately reflect the start time of an employee's work day
    when she logs into Softphone before other software applications.  Plaintiffs and other employees,

26  at times, each logged into Softphone first, thus creating instances where Time Tracker and
    Softphone times match and also reflect accurate timekeeping information.  When employees

27  logged out of Softphone as their final action at the end of the day, that logoff time will also be an

28  accurate time stamp of the end of the work day.  *See, infra* pp. 21-22.

1    In the event the Court is inclined to conditionally certify a collective action, it should be an

2    extremely narrow one, limited to those employees who reported to the supervisors who Plaintiffs

3    allege instructed them to change certain time entries to match Softphone login and logout times.

4    Plaintiffs have not provided any justification for sending FLSA notices to tens of thousands of

5    employees across the nation.  Nor should any notices be sent to employees who released their

6    FLSA claims in prior court-approved settlements, or who signed mutual arbitration agreements

7    with Wells Fargo.  Notice can only be sent to "potential participants," and "alerting those who

8    cannot ultimately participate in the collective merely stirs up litigation, which is prohibited.

9    *Swales, supra,* 985 F.3d at 441; *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 169 (1989).[3]

10   **II.    FACTUAL BACKGROUND**

11       **A.    Plaintiffs Were Aware of Wells Fargo's Compliant Timekeeping Policies**

12       Throughout the applicable period, Wells Fargo had timekeeping policies that complied

13   with the FLSA.  Wells Fargo's intranet "Teamworks," provided the following:

14       **Wells Fargo's commitment to proper compensation for all team members**

15       All team members use Time Tracker—Wells Fargo's enterprise-wide timekeeping
16       system – to request and record paid time away, holidays, community service time,
         bereavement, jury duty, and other time away from work.
17       If you're a nonexempt team member, you'll also use Time Tracker to record actual
         time worked and complete timesheets so you'll be paid.
18
19       Wells Fargo is committed to being a great place to work and a company where
         people are valued as the most important competitive advantage.  **In keeping with**
20       **this commitment, Wells Fargo wants to remind all nonexempt team members**
         **that they are entitled to receive pay for all hours they actually work, even if**
21       **those hours exceed regularly scheduled hours.**

22   Declaration of Alesha Lusk-Herron in Support of Wells Fargo Bank, N.A.'s Opposition to Motion

23   to Conditionally Certify Action ("Lusk-Herron Decl."), Exhibits N-R.  Teamworks further

24   explained the process of "Time entry and approval," which requires team members to:

25       **record their actual start and end times . . . for example, 8:06 a.m. to 5:10 p.m.,**
26       **not simply 8:00 a.m. to 5:00 p.m.**

27   _____
[3] Plaintiffs did not submit a draft notice with the moving papers.  Wells Fargo reserves its right to
28   review and object to any proposed notice, should one be required.

Lusk-Herron Decl., Exs. N-R; Thompson Depo. at 198:10-199:15 (Bern Decl. Ex. 1); Harrison

Depo. at 189:10-23 (Bern Decl. Ex. 3); Droesch Depo. at 149:8-24 (Bern Decl. Ex. 2).

After entering their time, team members click a "complete" button certifying that the time

they have entered in Time Tracker is accurate.  Lusk-Herron Decl., Exs. N through R; Thompson

Depo. at 198:10-199:15 (Bern Decl. Ex. 1); Harrison Depo. at 189:10-23 (Bern Decl. Ex. 3);

Droesch Depo. at 149:8-24 (Bern Decl. Ex. 2).

Wells Fargo's intranet further directs nonexempt team members to:

- Report all your hours worked to ensure that you are paid for all time actually worked, even when it exceeds your scheduled hours.

- Obtain your manager's approval if you think you are going to work overtime.
  **Note**: You must record time worked in Time Tracker even if you worked the extra time without management preapproval.  You will be paid for that time.

- Check with your manager if you are unsure of your exemption status or it you have questions or concerns about overtime or time recording.

- If you feel you are receiving incorrect guidance on entering your time or overtime worked, you can complete the Employee Relations eForm to request a consultation, or contact the Ethicsline by submitting the Wells Fargo Ethicsline Web Reporting form or calling 1-800-382-7250.

Lusk-Herron Decl., Exs. N through R.

The Teamworks intranet site also provides the following additional guidance:

Wells Fargo's policy states that managers will not:

- Deny overtime pay to a team member, even if the overtime was unauthorized.

- Require or knowingly allow team members to work extra hours off the clock (without recording the time in Time Tracker

- Ask team members to waive their right to overtime pay.

Lusk-Herron Decl., Exs. N through R.

Finally, the Wells Fargo Team Member Handbook provided the following policy at all

relevant times here regarding "Work Hours":

> If you're in a non-exempt position (see Overtime) you are responsible for submitting timely and accurate records in Time Tracker of the hours you work. **This includes any time spent on electronic devices for business purposes.**

Lusk-Herron Decl., Exs. B through F; Exs. G through I (similar).

Throughout the putative collective period, Wells Fargo sent an annual email reminder to all nonexempt team members reiterating these timekeeping policies:

> If you have concerns or are receiving conflicting guidance about recording your hours worked, contact the Ethicsline at 1-800-382-7250.  You may also complete the HR advisor eForm to request a consultation or visit the Contact HR advisor page to learn more.

Lusk-Herron Decl., Exs. J through M.

Plaintiffs were aware of Wells Fargo's written timekeeping policies as set forth in the Team Member Handbook, Teamworks and the annual email reminders, and that such policies directed them to record all time worked, including all log-in and log-out time. Thompson Depo. at 263:1-264:4, 272:22-273:17 (Bern Decl. Ex. 1); Droesch Depo. at 70:5-21, 114:11-116:2 (Bern Decl. Ex. 2); Harrison Depo. at 193:4-14, 202:7-203:12 (Bern Decl. Ex. 3).

### B.   Plaintiffs Certified That Their Time Entries Were Accurate And Never Reported Any Concerns to Human Resources or the EthicsLine

Plaintiffs submitted a time sheet for every week that they worked at Wells Fargo, and when doing so, they "certified" the accuracy of their time entries in Time Tracker by hitting the "complete" button that displayed the following statement:

> By clicking on "Complete", I certify that all of the information on the timesheet--hours worked or taken as time off and meal and rest periods status—is accurate … I understand that I am subject to corrective action, which may include termination of employment, if I have failed to record or have misrepresented any information on my timesheet.

(Bern Decl. Ex. 5); Thompson Depo. at 198:10-199:15 (Bern Decl. Ex. 1);  Droesch Depo. at 149:8-150:9 (Bern Decl. Ex. 2); Harrison Depo. at 189:10-24 (Bern Decl. Ex. 3).

After certifying that they were accurately reporting their time worked, Plaintiffs never once contacted or submitted a complaint through the established channels at Human Resources, Employee Relations or the confidential EthicsLine to raise a concern or ask a question about the timekeeping guidance that was allegedly being provided to them orally by their supervisors, in

1   contravention of Wells Fargo's policies.  Lusk-Herron Decl., Exs. N-R; Thompson Depo. at

2   182:13-19, 184:23-185:14, 186:6-187:7 (Bern Decl. Ex. 1); Droesch Depo. at 83:20-84:11,

3   128:18-21 (Bern Decl. Ex. 2); Harrison Depo. at 194:1-195:10 (Bern Decl. Ex. 3).

4       **C.**   **Plaintiffs Seek Conditional Certification of a Broad Collective That Reported To More Than 4,800 Supervisors At Over 590 Call Centers Nationwide**

5          Plaintiffs seek conditional certification of a collective comprised of "Telephone Bankers"

6   working for Wells Fargo from September 28, 2017 to the present.  (Mot. at 2.)  They define

7   "Telephone Bankers" as "telephone-dedicated employees who work in its call centers across the

8   nation."  (*Id.* at 1.)  While Plaintiffs *exclude* from the collective those employees who released

9   their claims pursuant to the court-approved settlements in *Harris/Kerness* and *Singer*, (Mot. at 2),

10  they inconsistently argue that those same settling employees should not be precluded from

11  participating in this action.  (Mot. at 17.)  Plaintiffs thus request that notice be sent to

12  approximately 35,000 call center employees who reported to more than 4,800 different supervisors

13  at over 590 different locations.  Lusk-Herron Decl., ¶ 8.

14         Plaintiffs allege that Wells Fargo had a "common plan or policy requiring call center

15  employees to be logged into Softphone and ready to handle a customer call from the beginning to

16  the end of their scheduled shifts.  (Mot. at 3; Compl. ¶ 3.)  They further allege that before

17  employees could log into Softphone and accept customer calls, they first needed to open various

18  software applications.  At the conclusion of their shifts, employees were to close software

19  applications and secure their computers before leaving.  (Mot. at 4; Compl. ¶ 32.)  They assert that

20  the Bank maintained an unwritten, orally-communicated policy that all such preliminary and post-

21  liminary work had to be performed off-the-clock, and that employees were only permitted to

22  record and be paid for the time they were logged into Softphone. (Mot. at 1, 3-4; Compl. ¶ 29, 44.)

23      **D.**   **At Deposition, Thompson Contradicted The Allegations In Her Complaint**

24          **1.**   **Thompson Accurately Recorded All Time Worked In Time Tracker, Including Time Worked Before and After Her Scheduled Shift**

25

26          Contrary to the allegations in her complaint and motion, Thompson admitted that it was

27  her regular practice when working at Wells Fargo to record as the start of her day the time that she

28  sat down at her desk and started logging into her computer.

*Q. So would you then enter the time you logged into Windows in Time Tracker as a regular practice?*
*A. As a regular practice, yes. That's my time.*
*Q. All right. So that's accurate time for the beginning of your day that you would put into Time Tracker, right?*
*A. Yes, That started my time as soon as I get there and I pull in, yes."*

Thompson Depo. at 70:11-19 (Bern Decl. Ex. 1). Similarly, Thompson testified that it was her regular practice to enter into Time Tracker the accurate time that she completed work for the day.

*Q. I just want to be clear. The time that you finished work in your mind, that your day was done, is the time that you would enter into Time Tracker at the end of your day, correct?*
*A. Yes. If I –I can go ahead and put that time in because I already know, yes, that was a long day for me. So I can kind of -- I saw the time. I went ahead and just did it since I'm already completing everything else."*

_____

*Q. And so you were attempting to enter your time in Time Tracker accurately with regard to the end of your workday, right?*
*A. Yes."*

Thompson Depo. at 81:21-82:4, 99:2-5 (Bern Decl. Ex. 1).

On days when Thompson sat down at her desk to begin work before her scheduled shift, she recorded that time in Time Tracker. Thompson Depo. at 70:11-19, 69:25-70:1 (Bern Decl. Ex. 1). Likewise, at the end of her scheduled shift, if she was on a call with a customer that ran past the end of her shift, she would complete the call and accurately record in Time Tracker the end of her work day. *Id. at* 78:9-80:2.

### 2. Thompson Claims Her Supervisor, On Occasion, Raised Questions About The Accuracy of Her Time Entries

Thompson claims that after accurately entering her time in Time Tracker, her supervisor, Daisy Robinson, "sometimes" questioned the time she recorded, and that in response, she "sometimes" changed her time entries so that the beginning and/or end of her day as recorded in Time Tracker matched the time that she logged into or out of her Softphone. Thompson Depo. at 47:6-48:20 (Bern Decl. Ex. 1). When asked to identify the <u>first</u> time that Ms. Robinson asked her to change Time Tracker entries to "match" her Softphone times, Thompson admitted that she could not recall "***if she [Robinson] said it or when she <u>may</u> have said it***." *Id.* at 63:2-15.

WELLS FARGO BANK, N.A.'S OPPOSITION TO PLAINTIFFS' MOTION
TO CONDITIONALLY CERTIFY COLLECTIVE FLSA ACTION

1   Thompson also admitted that Robinson's alleged inquiries were intermittent, and that often

2   Robinson approved the accurate time that she regularly entered into Time Tracker without

3   question. *Id.* at 47:6-48:20 (*"But there's times too, I can see that even when I complete my Time*

4   *Tracker, she approved it, but she didn't review it. And I did pay myself for eight—there was a*

5   *period in time that she did it. That's why I say it is different. It just depends on –I don't know if*

6   *she's really paying attention or not because sometimes she do it; sometimes she don't."*)  When

7   asked to identify how many times (since September 28, 2017) her supervisor questioned her about

8   her time entries, Thompson testified "several different times," and "I know it was a couple

9   different times on different occasions." *Id.* at 50:19-24, 132:7-15.  When asked how often her

10  supervisor requested that she change a time entry, she could not truthfully say that it had happened

11  more than 10 times in total. ("I'm not sure.  I do apologize.  I really don't know.") *Id.* at 51:8-17.

12  ### 3.   Thompson's Manager Told Her in Writing That Her Time Tracker Did Not Need To Match Her Softphone Login/Logout Times

13  At deposition, Thompson could recall only a single specific instance, from November

14  2019, when her supervisor asked her to make a change to two of her time entries before approving

15  her time sheet for the week. *Id.* at 99:6-18.  Their exchange was captured in a series of "instant

16  messages," which Thompson referred to as "my proof of what I'm talking about when it comes to

17  my supervisors wanting everybody to know you need to change your time." *Id.* at 216:2-9;

18  Thompson Depo. Ex. 15 (Bern Decl. Ex. 6).  In this written exchange, Thompson's manager wrote

19  "I have questions reference [sic] your time entered in Time Tracker on 11/15 and 11/21.  Those

20  times do not agree with sign-on times in daily agent."  Thompson Depo. Ex. 15 at 1 (Bern Decl.

21  Ex. 6); Thompson Depo. at 217:15-25 (Bern Decl. Ex. 1).  In response, Thompson wrote "I see the

22  error and the tracker will not allow me to adjust it." *Id.* (Depo Ex. 15) at 2; Thompson Depo. at

23  218:21-219:8.  Thompson then provided an explanation why her Time Tracker entries differed

24  substantially from the time she was logged into the Softphone system. *Id.* (Depo Ex. 15).

25  Thompson *offered* to change the entries so that they matched, stating "if you want me to put what

26  Softphone says, I will." *Id.*; Thompson Depo. at 220:6-13.  Her supervisor disagreed, and replied

27  as follows:

28

WELLS FARGO BANK, N.A.'S OPPOSITION TO PLAINTIFFS' MOTION
TO CONDITIONALLY CERTIFY COLLECTIVE FLSA ACTION

1

2

3

***Shakara, I do not expect you to input the exact time indicate[d] in daily agent due to finishing claim and/or signing out to leave for the day.*** *That is why it is so important that your time sheet is completed daily when you are here and you also advise of issues in the site chat.  Thanks.*

4   *Id.* (Depo Ex. 15) (emphasis added).  Thompson made changes to her time entries and her time

5   was approved by Robinson, with a note that further changes could be made when she was back in

6   the office, and that Thompson would be paid for any additional time in the next pay period.  *Id.* at

7   2-3.

8        In reviewing Thompson's time entries for this two-week period, Robinson raised questions

9   about Thompson's time entries for only 2 of the 10 days worked during that period, November 15,

10  (Friday) and November 21, 2019 (Thursday). Thompson Depo. Ex. 15 (Bern Decl. Ex. 6);

11  Thompson Depo. at 258:19-259:18.  Thompson's Time Tracker and Softphone did not match for

12  many other days she worked during that two week.  Declaration of Hossein Borhani ("Borhani

13  Decl."), ¶ 30.  Thompson admitted that Robinson did not raise questions about the other days in

14  this two-week period.  Thompson Depo. at 258:19-259:18 (Bern Decl. Ex. 1).

15           **4.      Thompson's Time Tracker Entries Do Not Match Her Softphone
                      Logon/Logoff Most of The Time**

16

17       When Thompson's Time Tracker entries, which were used to generate her pay checks, are

18  compared to her Softphone login and logoff times, they do not match for the majority of her work

19  days.  Specifically, Thompson's Time Tracker and Softphone entries matched only  33% at the

    start of her day, and 59% at the end of her day. Borhani Decl., ¶¶ 28-29.

20           **5.      Thompson Sometimes Logged Into Her Softphone Before Launching
                      Other Software Applications**

21

22       While Thompson declares that she was "required" to open numerous software application

23  *before* she could log into Softphone, she testified at deposition that she sometimes logged into her

24  Softphone first.  Declaration of Shakara Thompson in Support of Motion at 3-5 (ECF No. 29-5).

25  Thompson testified that her supervisor instructed her to log in and then out of Softphone before

26  opening other programs at the start of her day, in order to create a digital record that she was

27  present.  Thompson Depo. at 167:3-168:4 (Bern Decl. Ex. 1).  This entire process of initially

28  logging into and then out of Softphone at the start of the day typically takes well under one

-10-

WELLS FARGO BANK, N.A.'S OPPOSITION TO PLAINTIFFS' MOTION
TO CONDITIONALLY CERTIFY COLLECTIVE FLSA ACTION

1    minute.  Declaration of Siripun Barnes ("Barnes Decl."), ¶ 6; Declaration of Marbella Figueroa

2    ("Figueroa Decl."), ¶ 4.

3           After logging into and immediately out of Softphone, Thompson would then bring up her

4    other software applications.  Thompson Depo Ex. 2 (Bern Decl. Ex. 4); *Id*. at 166:9-15; 167:7-

5    168:4 (Bern Decl. Ex. 1).  After she had opened her applications, she would log back into

6    Softphone and begin taking customer calls.  Thompson Depo. at 167:18-168:4 (Bern Decl. Ex. 1).

7    On days that Thompson engaged in this practice, her Softphone time and Time Tracker start time

8    would likely be the same, and also accurately reflect the time her work day began.  Barnes Decl., ¶

9    6; Figueroa Decl., ¶ 4.  When the days she performed the fast login/logout are eliminated,

10   Thompson's Time Tracker and Softphone times at the start of her work day matched only 15% of

11   the time.  Borhani Decl. ¶¶ 28, 33-34.

12          **6.      Supervisors at the Charlotte Call Center Did Not Instruct Their Team
                      Members To Under-Report Their Time Worked**

13

14          Thompson's allegations about oral instructions from her supervisor do not extend to other

15   supervisors who worked at the Charlotte, North Carolina call center.  Prior to reporting to

16   Robinson in late 2017, Thompson reported to Caprice Miller.  According to Thompson,

17   Supervisor Miller told her direct reports, including Ms. Thompson, "When you hit—when you get

     into your cubicle, as soon as you touch your computer, that is when your time starts, not what's in

18   the phone."  Thompson Depo. at 31:12-32:2, 39:3-6 (Bern Decl. Ex. 1).  Ms. Thompson followed

19   Miller's direction to record in Time Tracker all of the time that she worked when reporting to her.

20          Other supervisors working during the relevant time period at the Charlotte call center also

21   communicated to their direct reports to accurately record in Time Tracker all time worked—

22   including preliminary and post-liminary logon/logoff tasks.  Barnes Decl., ¶¶ 2, 4.

23          **7.      Thompson Recorded in Time Tracker That She Was Working At Her
                      Desk When She Was Not Even in the Building**

24

25          Thompson manually recorded her time for each day worked into Time Tracker.  Thompson

26   Depo. at 86:24-87:6 (Bern Decl. Ex. 1).  She did not perform any work before arriving at her desk,

27   or after leaving her desk at the end of her day.  *Id*. at 105:24-106:10, 171:15-172:5 (Bern Decl. Ex.

28

1). On some days, Thompson recorded in Time Tracker that she was working *before* she had even entered the building, and also *after* she had departed work for the day.

Upon arriving at work, Thompson swiped her employee badge on a reader, which allowed her to pass through a security door. Barnes Decl., ¶ 14. At the end of her day, she swiped her badge to leave the building. On 43 days, Thompson recorded a start time in Time Tracker that was *earlier* than her first entry to the building, and on 52 days she recorded that she was still working, even after she had swiped out of the building. Borhani Decl. ¶ ¶ 31-32. Thompson over-recorded her time at the start of her day 11% of the time, and over-recorded her time at the end of her day 13 % of the time. *Id*. Thompson was paid for the time she recorded on these days. Thompson Depo. at 171:2-172:15. Lusk-Herron Decl., ¶ 5.

### E. **Plaintiff Droesch's Deposition Testimony Contradicts The Allegations In The Complaint And Her Motion To Conditionally Certify**

#### 1. **Droesch Testified That She Was Orally Instructed To "Exactly Match" Her Time Tracker to Her Softphone Login/Logout Times**

Droesch began training for her position as a Premier Phone Banker in December 2019.[4] She worked for less than three months, most of which was spent in training. Droesch Depo. at 62:8-10, 103:16-104:10, 110:22-111:7 (Bern Decl. Ex. 2). She claims that during the days when she was answering calls, she was orally instructed by her supervisor to "exactly match" her Time Tracker to the times she logged in and out of her Softphone. Droesch Depo. at 119:10-120:25, 145:4-8, 138:7-139:18, 141:25-143:10 (oral); 147:2-10 ("match exactly"); 154:17-155:6; 187:6-12 (Bern Decl. Ex. 2). Droesch testified that she complied with these oral instructions despite knowing that Wells Fargo policy directed her to record all time spent for work purposes on an electronic device, including on her computer and telephone. *Id.* at 114:17-115:6, 118:7-119:5.

#### 2. **Droesch's Time Tracker Entries Rarely Match Her Softphone Login/Logout times**

Although Droesch testified that she was required to, and did, "exactly match" her Time Tracker entries with her Softphone logon times, those times in fact rarely matched. Droesch's

---

[4] Droesch executed an arbitration agreement with Wells Fargo in November 2019. Droesch Depo. at 58:22-61:20 (Bern Decl. Ex. 2). Wells Fargo has moved to compel her claims to arbitration.

1   Time Tracker and Softphone data for the 26 days during which she fielded incoming customer

2   calls, the starting time that she entered into Time Tracker matched her Softphone only 3 times, and

3   the time Droesch recorded as the conclusion of her work day in Time Tracker did not match the

4   time that she logged out of Softphone, even once.  Borhani Decl., ¶¶ 33-34.

5               **3.        Droesch Was Solicited To Become A Plaintiff In This Action**

6          After resigning in March 2021, Droesch did not seek a lawyer to pursue a lawsuit against

7   Wells Fargo.  Droesch Depo. at 23:2-4.  Rather, she was contacted by an "investigator" in July or

8   August 2020, who asked about her "experience" at Wells Fargo.[5]  *Id.* at 23:6-22, 27:4-10.  After

9   this call, nothing happened for several weeks.  *Id.* at 25:18-25.  Then Droesch received a call from

10  Plaintiffs' counsel, who she did not know, and to whom she had never before spoken.  After that

11  call, Droesch retained Ms. Humphrey as her lawyer to pursue this class and collective action.

12          **F.     At Deposition, Harrison Contradicted The Allegations In The Complaint**

13              **1.        Harrison Accurately Recorded All Time Worked In Time Tracker,
                            Including Time Worked Before and After His Scheduled Shift**

14

15          Harrison worked in the same department as his girlfriend, Plaintiff Thompson.[6]  He opted-

16  into this case September 28, 2020. Consent to Join Form (ECF No. 6-8).  Like Thompson,

17  Harrison testified that he *accurately recorded* all of the time that he worked in Time Tracker,

18  including time working prior to the start, and after the end, of his scheduled shift.  Harrison Depo.

19  at 23:23-24:6, 43:13-19, 75:2-13, 190:4-22, 59:3-9, 73:15-74:16 (Bern Decl. Ex. 3).

20              **2.        Harrison Claims That His Supervisor Instructed Him To Correct His
                            Time Tracker Entries Between 10-20 Times Over a 3.5-Year Period**

21          Harrison testified that over the 3.5 years he was employed at Wells Fargo, his supervisor

22  asked him *between 10 and 20 times* <u>in total</u> to change his time entries so that they matched his

23  softphone login or logout time:

24          *Q.· ·Okay.· Well, I seem to be having a hard time understanding how -- how often this
            occurred where you put in the correct time to start your work day, and then someone asked*

25  _____

26  [5] Droesch was instructed not to answer questions about the investigator's call, even though no
    attorney-client relationship existed at that time.  Droesch Depo. at 28:17-29:7 (Bern Decl. Ex. 2).

27  [6] Harrison executed a mutual arbitration agreement with Wells Fargo in November 2019.  (Bern

28  Decl. Ex. 3).  In a separate motion, Wells Fargo has moved to compel his claims to arbitration.

*you to change that time.  Did that happen all the time that you put in the correct time that you started to work when you sat down at your desk?*
*A.· ·I mean, it happened throughout my career working at Wells Fargo.· So I can't give you an estimate.· I can't say 20, 25, 30.· It was just a common practice that they did.· So I can't give you a number in regards to how many times it happened.· I do apologize.*
*Q.· ·So you can't estimate for me how many times you were asked to change your time from when you · ·started to sit down at your desk and start your work day to some later time, which is when you took your ·first call; is that right?*
*A.· ·No.· I can't give you a number but I -- I can say it was over ten times.· Over ten times easily. I can at least say that.*
*Q.· ·It was it over 20 times?*
*A.· Like I said, it was over ten.· I don't know if it was over 20.· I know it was over ten easily.*

Harrison Depo. at 26:11-21 (Bern Decl. Ex. 3); *see also id.* at 75:2-13 (10-20 times that he was asked to change his time entry for either start of end of his work day over 3.5-year period).

Harrison admitted that some of the time entry changes requested by his supervisor were necessary to correct mistakes he had made.  *Id.* at 191:16-18 ("I'm not perfect, I am pretty sure I had made mistakes before and had to correct something that was a mistake on my end.").

### 3.   Harrison's Time Tracker Entries Do Not Match His Softphone Logon/Logoff Most of The Time

When Harrison's Time Tracker entries that were used to generate his pay checks are compared to his Softphone login and logoff times, they do not match in the majority of cases. Specifically, during the relevant time period, Harrison's Time Tracker and Softphone entries matched only 38% at the start of his day, and 54% at the end of his day.  Borhani Decl., ¶¶ 38-39.

### 4.   Harrison Recorded in Time Tracker That He Was Working at His Desk When He Was Not Even in the Building

Harrison manually recorded his time in Time Tracker.  Harrison Depo. at 96:2-6 (Bern Decl. Ex. 3).  Harrison admitted that he did not perform any work before arriving at his desk, or after leaving his desk at the end of the day.  *Id.* at 59:3-9, 73:19-74:4.  Whether intentionally or by mistake, Harrison recorded in Time Tracker that he was working *before* he had even entered the building, and also *after* he had departed for the day.

Upon arriving at work each day, Harrison swiped his employee badge on a badge reader, which allowed him to pass through a security door. Barnes Decl., ¶ 14.  At the end of his day, he swiped his badge to leave the building.  On 44 days, Harrison recorded in Time Tracker a time that

1   was earlier than his first entry to the building, and on 15 days he recorded that he was still working

2   even after he had swiped out of the building.  Borhani Decl., ¶¶ 40-41.  In total, Harrison over-

3   recorded his time 11% of the time at the start of the day, and 4% of the time at the end.  *Id.*

4   Harrison was paid for all the time he recorded on these days in Time Tracker.  Lusk-Herron Decl.,

5   ¶ 5; Harrison Depo. at 178:18-21.

6   **III.    ARGUMENT**

7       A.    <u>**Plaintiffs Have Not Met Their Burden of Showing That All Telephone-
             Dedicated Employees Across The Nation Are "Similarly Situated"**</u>

8       The FLSA provides employees with the right to litigate jointly if they (1) claim a violation

9   of the FLSA; (2) are "similarly situated" to each other; and (3) affirmatively opt in to the litigation

10  in writing. 29 U.S.C. § 216(b); *Campbell*, 903 F.3d at 1100.  The Ninth Circuit has interpreted the

11  phrase "similarly situated" to require "a legal or factual similarity material to the resolution of the

12  party-plaintiffs' claims, in the sense of having the potential to advance those claims, collectively,

13  to some resolution." *Id.* at 1115 (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)).

14  Under *Campbell*, a plaintiff cannot just point to ***any*** similarity.  Rather, she must demonstrate that

15  the similarity is "material."  *See id.*  Plaintiff has not —and cannot—make this showing.

16      "While plaintiffs' burden [at the conditional certification stage] is not onerous, neither is it

17  invisible." *Songer v. Dillon Res., Inc.*, 569 F. Supp. 2d 703, 706 (N.D. Texas 2008); *Litty v.*

18  *Merrill Lynch & Co.*, No. CV 14-0425 PA (PJWx), 2014 WL 5904907, at *8 (C.D. Cal. Aug. 4,

19  2014) (Conditional certification "is by no means automatic.").  To meet this evidentiary burden,

20  Plaintiff must show that she and members of the proposed class "were together the victims of a

21  single decision, policy or plan" which caused her and the putative class members to not receive

22  overtime pay.  *Nen Thio v. Genji, LLC*, 14 F. Supp. 3d 1324, 1340 (N.D. Cal. 2014).

23          1.    Off-The-Clock Cases Relying Upon Oral Instructions From
                  Supervisors Necessarily Involve Individualized Inquiries

24

25      Plaintiffs seek conditional certification of a claim based on alleged *oral* instructions from

26  their supervisors that contravened Wells Fargo's written and FLSA-compliant timekeeping

27  policies.  But Courts frequently deny conditional and class certification motions based on alleged

28  oral representations that contradict formal written policies.  *See Howard v. Gap, Inc.* No. C 06-

06773 WHA, 2009 WL 3571984, at *6 (N.D. Cal. Oct. 29, 2009) (denying certification where

plaintiff's allegation rested on "supposed oral instructions individual managers made to individual

sales associates"); *Madrigal v. Tommy Bahama Grp, Inc.,* No. CV 09-08924 SJO CWx, 2011 WL

10511339, at *5 (C.D. Cal. June 27, 2011) (denying certification where "Plaintiffs' causes of

action relating to Defendant's uniform policies are based substantially on oral rather than written

communications). *Juarez v. Jani-King of Cal., Inc.*, 273 F.R.D. 571, 574-79 (N.D. Cal. 2011)

(denying certification because allegations of "oral promises" contradicted Defendant's written

policy).  Where plaintiffs allege noncompliant policies or practices communicated verbally, they

are not similarly situated, and conditional certification is inappropriate. *Bentley v. Cty. of Los

Angeles*, No. CV 09-02063-RGK(CWX), 2009 WL 10674394, at *2 (C.D. Cal. Sept. 15, 2009).

In *Bentley v. Cty. of Los Angeles*, plaintiff alleged that he was improperly denied overtime

wages because his employer refused to approve overtime and erased hours from his time card

pursuant to a "pattern and practice" in his division.  *Bentley v. Cty. of Los Angeles*, No. CV 09-

02063-RGK(CWx), 2009 WL 10674394, at *1 (C.D. Cal. Sept. 15, 2009).  Plaintiff alleged that

other employees in the division "also suffered injuries as a result of this pattern and practice." *Id.*

Plaintiff did not provide evidence of a noncompliant written policy, and "offer[ed] only affidavits

in support of his claim." *Id.* at *2.  The Court denied conditional certification on the ground that

the "practices and policies alleged by Plaintiff [were] verbal only" and no written documents

memorialized such illegal policies. *Id.*

Courts are understandably reluctant to conditionally certify large collectives, such as the

one sought here, when the claims are based on alleged oral communications.  During the relevant

time period, Wells Fargo employed approximately 4,800 supervisors to oversee tens of thousands

of call center employees who worked in more than 590 locations.  Lusk-Herron Decl., ¶ 5.

Plaintiffs have offered no evidence that Wells Fargo implemented, through some chain of oral

communications, a "shadow" policy requiring all call center employees to ignore Wells Fargo's

Team Member Handbook, Teamworks website, and annual email reminder regarding proper and

accurate timekeeping practices. *Id.*, Exs. B-R.

WELLS FARGO BANK, N.A.'S OPPOSITION TO PLAINTIFFS' MOTION
TO CONDITIONALLY CERTIFY COLLECTIVE FLSA ACTION

1

2        **2.       Plaintiffs' Claims Cannot Be Resolved Without Individualized
                     Inquiries, Thus Precluding Conditional Certification**

3            Courts are dubious of collective actions for off-the-clock claims where the circumstances

4    regarding the alleged unpaid overtime vary from plaintiff to plaintiff or require individualized

5    inquiry.  Plaintiffs are not "similarly situated" where each plaintiff "may potentially claim that on

6    any given day he or she arrived early or departed outside of their regularly scheduled hours and

7    were not compensated for such" because "[t]he questions of fact will likely differ for each Plaintiff

8    and will be unduly burdensome to both Defendant and to the Court in managing as a collective

9    claim."  *See, e.g., Lawrence v. City of Phila., Pa.*, No. 03-CV-4009, 2004 WL 945139, at *2 (E.D.

10   Pa. Apr. 29, 2004).  Plaintiffs' testimony demonstrates why adjudication of their claims, and those

11   of the putative collective, will require individualized inquiries.

12           Thompson and Harrison described at deposition one-on-one conversations between

13   themselves and their supervisors, during which particular time entries were questioned for

14   accuracy.  Thompson Depo. at 29:22-30:14 (Bern Decl. Ex. 1); Harrison Depo. at 213:22-216:8,

15   74:13-16, 106:18-108:3 (Bern Decl. Ex. 3).  Both, however, were aware of Wells Fargo's written

16   timekeeping policies, and followed them by *accurately* recording their time in Time Tracker –

17   including time worked before and after the start and end of their scheduled shifts.  Thompson

18   Depo. at 69:19-70:14, 71:22-72:4, 47:22-48:12, 176:4-22, 171:2-10, 81:9-82:4, 99:2-5 (Bern Decl.

19   Ex. 1); Harrison Depo. at 224:8-225:4, 193:4-14, 24:3-6, 93:5-23 (Bern Decl. Ex. 3).  It was only

20   on those occasions when their time entries were questioned that they claim they were instructed by

21   a supervisor to change a time entry.  This occurred on fewer than 10 occasions for Thompson and

22   between 10-20 occasions for Harrison over a three-year period.  Harrison Depo. at 75:2-13, 26:11-

23   21 (Bern Decl. Ex. 3); Thompson Depo. at 50:19-52:1 (Bern Decl. Ex. 1).  Adjudication of these

24   claims will require an examination into each such day to determine the reason why the supervisor

25   questioned their time entries, whether a correction was necessary for the time to be accurate, and

26   whether the employee actually worked off-the-clock on that day.

27           Droesch's testimony demonstrates the individualized nature of her claim as well.  Droesch

28   testified that she was orally instructed that she must "exactly match" her Time Tracker entries to

1   her Softphone login and logoff times, or she would receive "corrective action" and possible

2   termination.  Droesch Depo. at 119:10-120:25, 145:4-8, 138:7-139:18, 141:25-143:10 (oral);

3   147:2-10 ("match exactly"); 154:17-155:6 (same) (Bern Decl. Ex. 2).  In fact, Droesch's Time

4   Tracker and Softphone data show that she *rarely* followed these instructions.  For the days

5   Droesch was "in the queue" handling customer calls, her Time Tracker matched her Softphone

6   login only 3 times at the start of her day, and never at the end.  Borhani Decl., ¶¶ 23-24.  The

7   circumstances of those four days will need to be examined further to resolve her claim.

8          Plaintiffs have also failed to establish that oral communications from supervisors to

9   employees were part of a "common plan or policy" because their own experiences show that the

10  alleged communications were personal and unique.  Thompson asserts that her supervisor wanted

11  her Time Tracker and Softphone times to match, but when asked what her supervisor said to her

12  and when, she testified that *she was not sure that her supervisor had ever said that to her*, or *if she*

13  *had, when*.  Thompson Depo. at 63:2-7 (Bern Decl. Ex. 1).  Thompson then pointed to her "proof"

14  that her supervisor required her Time Tracker and Softphone to match—a November 2019 written

15  exchange of messages with her supervisor.  But this exchange reveals that Thompson's supervisor

16  expressly told her that her Time Tracker and Softphone times did **not** need to match.  Thompson

17  Depo. at 226:16-23 (Bern Decl. Ex. 1) ("I do not expect you to input the exact time indicate [sic]

18  in daily agent due to finishing claim and/or signing out to leave for the day").  Other supervisors in

19  the Charlotte call center also have declared that they properly instructed the employees who

20  reported to them to record in Time Tracker all time worked pursuant to Wells Fargo compliant

21  timekeeping policies.  Barnes Decl., ¶¶ 2, 4.  Thus, any alleged communication between a

22  supervisor and employee will involve an individualized inquiry into what exactly was said in order

23  to learn the truth.

24         Yet additional individualized inquiries are required to resolve each employee's claim, such

25  as whether they launched Softphone before or after opening other applications on any particular

26  day.  Plaintiffs assert in the complaint and their motion that they were required to launch necessary

27  software applications *prior* to the start of their shifts and *before* they could log onto Softphone,

28

1    and that they could not record and be paid for that time.  (Mot. at 3; Compl. ¶ 26, 28-29.) [7]  But

2    Thompson testified that at times, she logged into Softphone first, *before* launching other

3    applications.  Thompson Depo. at 159:19-161:13; 167:3-168:4 (Bern Decl. Ex. 1).  She would

4    then immediately log out of Softphone, and bring up her other applications before logging back

5    into Softphone.  *Id.*  On these days, their Softphone logon time would accurately identify the

6    beginning of her work day because logging into Softphone takes well-under one minute.  Figueroa

7    Decl., ¶ 4; Barnes Decl., ¶ 6; Declaration of Shacoya Johnson ("Johnson Decl."), ¶ 5; Declaration

8    of Daivene Walker ("Walker Decl."), ¶ 3.  And she would have been paid for the time needed to

9    bring up her other systems as well.  Indeed, when you eliminate the days that Thompson

10   performed this quick logon and logoff from Softphone at the start of her day, only 15% of her

11   Softphone and Time Tracker times match.[8]  Borhani Decl., ¶ 35.

12         Bank employees have declared that they regularly launched Softphone as their *first* act of

13   the day, either because their supervisors suggested that practice to them, or because their other

14   programs were already open (and had not been closed) from the previous day.  Johnson Decl., ¶¶

15   4-5; Barnes Decl, ¶¶ 6, 12.; Walker Decl., ¶ 3  In each such instance, their initial Time Tracker and

16   Softphone times would likely match and also be accurate as well.  Johnson Decl., ¶¶ 4-5; Johnson

17   Decl., ¶ 3; Barnes Decl, ¶ 6; Figueroa Decl, ¶ 4.

18         The same sort of individualized inquires also would need to be made to assess the accuracy

19   of the end of the day time entry of every employee.  The process of logging off is much simpler

20   and faster—an employee can either close out all open applications at the end of the day (the

21   preferred approach), or instead close out of Softphone only, and then lock the computer by

22   _____

23   [7] Thompson and Harrison each recorded in Time Tracker that they were working before and/or
     after the start of their scheduled shifts.  Borhani Decl., ¶¶ 31-32, 40-41.  Whether that time was

24   spent logging into other applications on any particular day is an individualized inquiry.

25   [8] Similarly, on the three days when Droesch's Time Tracker and Softphone matched at the start of
     her day, she logged out of her Softphone within 3-5 *seconds* of logging in.  She then logged back

26   into Softphone some minutes later.  Borhani Decl., ¶ 27.  This practice is consistent with the
     testimony from Thompson that she logged into Softphone at the start of her work day, and then

27   immediately logged off to launch her other software applications. Thompson Depo. at 158:3-
     161:2; 167:7-168:4 (Bern Decl. Ex. 1).

28

WELLS FARGO BANK, N.A.'S OPPOSITION TO PLAINTIFFS' MOTION
TO CONDITIONALLY CERTIFY COLLECTIVE FLSA ACTION

pressing Control-Alt-Delete.  Barnes Decl, ¶¶ 11-12. Closing applications can be accomplished in well-under one minute, and closing out of Softphone and locking the computer takes only seconds. Johnson Decl., ¶ 7; Walker Decl., ¶ 4.

Plaintiffs also aver that they were required to stay logged on until the very end of their shift, and then log off without pay.  But their own records reflect that this was not the case, and that they often logged out before or after their shifts ended, and recorded a variety of times in Time Tracker as the end of the work day.  Borhani Decl., ¶¶ 32, 41.  Whether an employee recorded the minute or so that they needed to close down at the end of the day can only be determined by examining the order in which they closed their applications, and the manner in which they locked their computers for the night—each an individual issue.

The evidence before the Court points conclusively to the absence of a "factual similarity material to the resolution of the party-plaintiffs' claims, in the sense of having the potential to advance those claims, collectively, to some resolution."  *Campbell*, 903 F.3d at 1115.

### 3. Plaintiffs' Declarations Provide No Evidence of A "Common Plan or Policy" To Require Call Center Employees To Work Off-the-Clock

The only "evidence" submitted by Plaintiffs with their motion in support of their allegation that Wells Fargo has a "common policy or plan," delivered orally by thousands of supervisors to tens of thousands of employees, are their own vague and conclusory declarations.  These three nearly identical declarations were drafted by counsel and signed by these witnesses without change.  Harrison Depo. at 75:14-77:19, 81:17-23 (Bern Decl. Ex. 3); Droesch Depo. at 160:8-25 (Bern Decl. Ex. 2); Thompson Depo. at 109:3-15 (Bern Decl. Ex. 1).  When asked at deposition to explain the foundation for their statements, Plaintiffs conceded that they had no "personal knowledge" regarding many of their statements, despite attesting that the statements in the declaration were "based on my personal knowledge."  Droesch Decl., ¶ 1 (ECF No. 29-3); Thompson Decl., ¶ 1 (ECF No. 29-5); Harrison Decl., ¶ 1 (ECF No. 29-4).  Plaintiffs' showing falls well-short of that required to conditionally certify here.  When determining whether a putative collective should be conditionally certified, courts will disregard the Plaintiffs' declarations when contradicted by deposition testimony.  *Luksza v. TJX Cos., Inc.*, No. 2:11-CV-

1   01359-JCM-GWF, 2012 WL 3277049, at *11 (D. Nev. Aug. 8, 2012).  In *Luksza v. TJX*

2   *Companies, Inc.*, plaintiffs submitted declarations alleging they were victims of an illegal common

3   policy, but contradicted their allegations at deposition.  *Id.*  The Court refused to "consider the

4   evidence in the record supporting the Plaintiffs' claims they are victims of a common policy or

5   plan that violates the FLSA, while ignoring the discovery suggesting they are not," and denied

6   conditional certification.  *Id.*

7         Courts regularly deny conditional certification where plaintiffs' evidence of a non-

8   compliant policy is in the form of "boilerplate," "vague," or otherwise not credible declarations.

9   *Alaniz v. City of Los Angeles*, No. CV 04-8592-GAF (AJWx), 2014 WL 12694157, at *4 (C.D.

10  Cal. May 21, 2014), *aff'd sub nom. Campbell v. City of Los Angeles*, 903 F.3d 1090 (9th Cir.

11  2018) (plaintiffs' conclusory "boilerplate declarations [with] largely verbatim factual statements . .

12  .  'call[ed] into question the declarations' credibility' . . . [and] do not constitute substantial

13  evidence that Plaintiffs' claims arise out of a single policy, custom, or practice that resulted in

14  FLSA violations"); *Colson v. Avnet, Inc.*, 687 F. Supp. 2d 914, 929–30 (D. Ariz. 2010)

15  (discounting plaintiff's declaration on the basis that it referenced "'discussions ... with

16  [unidentified] co-workers,' unspecified 'company communications,' and undocumented

17  'interactions with other SMR employees and [defendant's] clients'"); *Simmons v. T–Mobile USA,*

18  *Inc.*, No. H–06–1820, 2007 WL 210008, at *5 (S.D. Tex. Jan. 24, 2007) (denying conditional

19  certification where plaintiff "presented only his own affidavit ... about other SRSRs working

20  uncompensated overtime, and that evidence is somewhat vague"); *Lallathin v. Ro Ro Inc.*, No.

21  1:09–cv–1293–WTL–DML, 2010 WL 2640271 (S.D. Ind. June 28, 2010) (denying conditional

22  certification where plaintiff's evidence of a common policy was in the form of a declaration in

23  which he asserted that he had been told by other employees that they were required to work off-

24  the-clock).

25        In paragraphs 4 and 5 of their declarations, Thompson, Droesch and Harrison each state

26  that only after opening all of the "necessary programs and systems" software programs "could I

27  log into Softphone, which commenced and recorded the paid portion of my workday."  Thompson

28  testified at deposition, however, that at times she logged into Softphone *before* other software

-21-                                            Case No. 3:20-cv-06751-JSC

WELLS FARGO BANK, N.A.'S OPPOSITION TO PLAINTIFFS' MOTION
TO CONDITIONALLY CERTIFY COLLECTIVE FLSA ACTION

applications, and then immediately logged out to avoid receiving a call while they opened up their other software applications.  Thompson Depo. at 160:19-161:13; 167:3-168:4 (Bern Decl. Ex. 1).  In such cases, her initial logon to Softphone would have occurred in less than one minute, and therefore provided an accurate time for the start of her day.  Harrison also employed this practice during his employment, and Droesch employed the same quick login/logout every day that she was handling incoming customer calls at Wells Fargo.  Borhani Decl., ¶¶ 26, 42.

The second part of paragraph 5 is also incorrect—Softphone does not "record[] the paid portion" of their workday.  Thompson, Droesch and Harrison all testified that they *manually* entered the times that they started and conclude work in Time Tracker, and that those times were not generated by the Softphone software.  In addition, Thompson and Harrison testified that on most days, the time they entered into Time Tracker accurately reflected the time that they were working, and did not simply match the Softphone logon and logoff times.  Thompson Depo. at 69:19-70:14, 71:22-72:4, 47:22-48:12, 176:4-22, 171:2-10, 81:19-82:4, 99:2-5 (Bern Decl. Ex. 1); Harrison Depo. at 224:8-225:4, 24:3-6, 23:23-24:6 (Bern Decl. Ex. 3).

In paragraph 7, Plaintiffs state that they had their "pre- and/or post-shift work rounded away from my pay."  At deposition, however, they conceded that Wells Fargo did not "round away" any time that was recorded in Time Tracker.  Harrison Depo. at 104:3-21 (Bern Decl. Ex. 3); Thompson Depo. at 124:23-125:15, 126:14-127:7 (Bern Decl. Ex. 1); Droesch Depo. at 121:1-6 (Bern Decl. Ex. 2).  Rather, they testified that only *they* could enter and change their time in Time Tracker, and to the extent they were not paid for time worked off-the-clock, it was because *they* entered inaccurate times in Time Tracker.  Thompson Depo. at 47:22-48:13, 71:1-72:4 (Bern Decl. Ex. 1); Harrison Depo. at 24:24-25:18 (Bern Decl. Ex. 3).  Wells Fargo pays employees to the minute on time that is sent from Time Tracker to payroll, and there is no rounding away of any time worked before or after scheduled shifts. Lusk-Herron Decl., ¶ 6.

In paragraph 8, Plaintiffs claim they were "trained" by Wells Fargo to work off-the-clock.  At deposition, however, all three declarants conceded that the formal Wells Fargo timekeeping training told them to follow the Bank's policy of accurate timekeeping—to the minute.  Plaintiffs explained at deposition that they were allegedly "trained" to do otherwise by the oral statements

occasionally made by their supervisors, and not by Wells Fargo.  Harrison Depo. at 109:14-110:16 (Bern Decl. Ex. 3); Thompson Depo. at 60:15-22, 175:21-176:22, 127:24-128:16 (Bern Decl. Ex. 1); Droesch Depo. at 141:25-143:10 (Bern Decl. Ex. 2).

In paragraph 9, Plaintiffs declare that they are aware that improper "policies and practices were used and are still being used by Wells Fargo's other call centers."  When questioned, Plaintiffs conceded that they did ***not*** have personal knowledge as to what instructions supervisors were giving employees at the other call centers, or how employees in those call centers were recording their time.  Droesch Depo. at 170:14-171:9 (Bern Decl. Ex. 2); Harrison Depo. at 123:2-124:19, 130:1-131:2, 136:19-138:18 (Bern Decl. Ex. 3); Thompson Depo. at 136:12-23, 139:13-140:3 (Bern Decl. Ex. 1).  Droesch conceded that her only knowledge on this topic was based on what her lawyer her.  Droesch Depo. at 170:11-171:9 (Bern Decl. Ex. 2) ("*Q. So that sentence in paragraph 9 is based just entirely—on no personal information whatsoever but just what your lawyers told you; is that correct?  A.  Correct.*").  Likewise, Harrison testified that he was unaware of current policies at Wells Fargo and had spoken to nobody who worked at other call center locations.  Harrison Depo. at 123:2-124:19, 130:1-131:2, 136:19-138:18 (Bern Decl. Ex. 3).  His knowledge was limited to his experience in the "Fraud & Claims" department in Charlotte.  Finally, Thompson conceded that she had no discussions with call center workers outside of the Fraud & Claims Operations department, which is just one of many call center operations within the Bank.  Thompson Depo. at 36:12-23; 139:24-140:3 (Bern Decl. Ex. 1).

### B.   Plaintiffs Arguments for Broad Notice Are Overreaching

Plaintiffs failed to submit any proposed form of Notice to the putative collective with their motion.  *See* Mot. at 3 (Referring to Notice attached to Humphrey Dec.; *see also* Humphrey Decl. (no draft attached).  Accordingly, Wells Fargo reserves it right to review and object to any notice later submitted by Plaintiffs to the Court for review.  Plaintiffs' motion, however, argues for a broad and intrusive notice that is neither supported by the law nor warranted in this action.

*First*, Plaintiffs request that employee names and personal contact information be produced to counsel, even though notice and opt-in processes are typically managed by a third-party administrator to assure neutrality and integrity in the process.  *Magana-Munoz v. W. Coast Berry*

1   *Farms, LLC*, No. 5:20-cv-02087-EJD, 2020 WL 3869188, at *7 (N.D. Cal. July 9, 2020) ("a third

2   party is the best way to ensure the neutrality and integrity of the opt-in process."). Given that

3   Droesch was solicited to bring this action, employee information should be provided to a neutral

4   administrator only. *See supra* p. 13 *see also*, *Russell v. Wells Fargo & Co.*, No. C 07-3993 CW,

5   2008 WL 4104212, at *5 (N.D. Cal., Sept. 3, 2008) (refusing "to order the production of potential

6   class members' contact information to Plaintiff's counsel"). Counsel's contact information will be

7   in the notice and any "potential class members may contact counsel if they wish." *Id.*

8       *Second*, Plaintiffs seek an overreaching amount of employee personal information, *inter*

9   *alia*, telephone numbers, email addresses, and birth dates. Phone numbers and other personal

10   information are "[un]necessary to provide notice to potential collective members," and need not be

11   disclosed. *Guilbaud v. Sprint/United Mgmt. Co.*, No. 13-cv-04357-VC, 2014 WL 10676582, at *2

12   (N.D. Cal. Oct. 3, 2014). Email addresses, too, are private information and disclosure is

13   unnecessary to effectuate notice. Because consent to opt-in cannot properly be given by email or

14   over the Internet, this personal information need not be disclosed. *Harris v. Vector Mktg. Corp.*,

15   716 F. Supp. 2d 835, 847 (N.D. Cal. 2010) ("[C]onsent 'via e-mail or Internet should not be

16   permitted.'"). There is no reason here to depart from typical notice by U.S. Mail.

17       *Third*, while Plaintiffs' definition of the putative collective excludes employees who

18   released their claims by opting-into the *Singer* or *Harris* settlements (Mot. at 2), they

19   inconsistently argue that those employees should receive notice because Plaintiffs plan to

20   collaterally attack those settlements. Putative collective action members who have settled their

21   claims  "are not eligible to be included in [an FLSA] conditional certification . . ." *Estorga v.*

22   *Santa Clara Valley Transp. Auth.*, No. 16-cv-02668-BLF, 2017 WL 2604665, at *5 (N.D. Cal.

23   June 15, 2017); *see, e.g.*, *Amaraut v. Sprint/United Mgmt. Co.*, No. 19-cv-411-WQH-MDD, 2019

24   WL 5696685, at *3 (S.D. Cal. Nov. 4, 2019) (ordering that notice "will not be sent to any

25   individuals who . . . have fully released their FLSA claims as part of class or collective action

26   settlements"). Plaintiffs have cited no case that supports their collateral attack on these judicially-

27   approved settlements in which they did not participate, and for which they would lack standing to

28

do so.  *See Fowler v. Wells Fargo Bank, N.A.*, No. 17-CV-02092-HSG, 2019 WL 330910, at *3 n.2 (N.D. Cal. Jan. 25, 2019) (non-class member "does not have standing to object").

Plaintiffs' reliance on *Donatti v. Charter Commc'ns, LLC.*, 2012 WL 5207585, at *1 (W.D. Mo. Oct. 22, 2012) is misplaced.  *Donatti* did not involve a collateral attack on a court-approved settlement of opt-in Plaintiffs.  *Id*., at *1 (finding that Plaintiffs who did not opt-in are not bound by settlement).  And while Plaintiffs rely on various district court decisions in the Second and Eighth Circuits to attack the *Singer* settlement, they concede that applicable Fifth Circuit law is to the contrary.  *See* Mot. at 17 (distinguishing *Swales v. KLLM Transp. Serv s., L.L.C.*, 985 F.3d 430, 441 (5th Cir., 2021)).  District Courts in the Ninth Circuit regularly approve the opt-in-by-check-cashing process that was used in *Harris*.  *See, e.g.*, *Sarinana v. DS Waters of Am., Inc.*, No. C-13-0905 EMC, 2014 WL 12770237, at *2 (N.D. Cal., June 9, 2014) (permitting opt-in-by-check process); *Viceral v. Mistras Grp., Inc.*, No. 15-cv-02198-EMC, 2016 WL 5907869, at *10 (N.D. Cal., Oct. 11, 2016) (same).

*Finally*, Plaintiffs' request that notice be sent to employees who have agreed to arbitrate. The enforceability of Wells Fargo's arbitration agreement is before the Court (ECF No. 28), and if upheld, notice to employees who cannot participate in this case would be inappropriate.  Like those who have previously settled their claims, employees bound to arbitrate have released their right to participate in the collective and are "not eligible to be included in [] conditional certification."  *Cf. Estorga*, 2017 WL 2604665, at *7.  Notice can only be sent to "potential participants," and "alerting those who cannot ultimately participate in the collective merely stirs up litigation," which is prohibited.  *Swales,* 985 F.3d at 441; *Hoffmann-La Roche*, 493 U.S. at 169.

IV.   **CONCLUSION**

Wells Fargo respectfully submits that Plaintiffs' motion should be denied.

1   DATED:  April 15, 2021                    MUNGER, TOLLES & OLSON LLP

2

3                                                        /s/ *Martin D. Bern*
                                             By:
4                                                   MARTIN D. BERN
                                                    Attorneys for Wells Fargo Bank, N.A.
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WELLS FARGO BANK, N.A.'S OPPOSITION TO PLAINTIFFS' MOTION
TO CONDITIONALLY CERTIFY COLLECTIVE FLSA ACTION